UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CAMERON CUNNINGHAM,     )
     )
     Plaintiff,     )
     )
     v.     )     No. 17 C 5070
     )
CITY OF CHICAGO, a municipal corporation,     )     Judge Rebecca R. Pallmeyer
OFFICER ROMAN, Star 22, OFFICER AUGLE,     )
Star 12848, and  OFFICER LIPKIN, Star 3603,     )
     )
     Defendants.     )

## MEMORANDUM OPINION AND ORDER

On July 9, 2016, Plaintiff Cameron Cunningham participated in a Black Lives Matter protest in Chicago that started at the Taste of Chicago food event in Grant Park and marched north to the upscale shopping district on North Michigan Avenue.  As the demonstration gathered in front of the H&M and Columbia stores on Michigan Avenue, Chicago Police Department ("CPD") officers began arresting some protestors standing in the southbound lanes of the street, leading to a confrontation between the protestors and CPD.  What happened in the middle of the crowd of protestors and police between Plaintiff and Defendants Captain Melvin Roman, Officer Leo Augle, Officer Steven Lipkin, and other unidentified officers is the dispute at the heart of the case.  Plaintiff claims he was hit with a police baton and pulled to the ground where officers pressed his face and upper body into the asphalt while handcuffing him.  Defendants, however, maintain that Plaintiff lunged into the officers and was treated with no unnecessary force during the course of his arrest.  Plaintiff was subsequently charged with violating a municipal ordinance for failing to use due care as a pedestrian, though the charge was eventually nonsuited.

In July 2017, Plaintiff brought this suit against Defendant CPD Officers and brings claims for excessive force, battery, false arrest, false imprisonment, and malicious prosecution.  Plaintiff also asserts that Defendant City of Chicago is liable for the Illinois law claims under the state's indemnification statute and *respondeat superior.*  Defendants have moved for summary judgment

[115] on all claims.  For the reasons discussed below, the court grants Defendant's motion in part and denies it in part.

**BACKGROUND**

The parties' summary judgment submissions support the following facts:

On July 9, 2016, Plaintiff Cameron Cunningham, a twenty-four-year old recent graduate of the University of Chicago, attended a Black Lives Matter protest in Chicago, Illinois.  (Pl.'s Statement of Material Facts [128] (hereinafter "PSF") ¶¶ 1–2.)  The protest started that afternoon at the Taste of Chicago food event in Grant Park.  (Defs.' Statement of Material Facts [116] (hereinafter "DSF") ¶¶ 11–12.)  Having learned about it through social media, Plaintiff joined the protest at 3:30 p.m. at the Taste of Chicago event.  (*Id.* ¶ 12.)  Later in the afternoon, the demonstrators began to march north from Grant Park up Michigan Avenue, and Plaintiff joined that northward march.  (*Id.*)  The protestors marched in the street.  (*Id.* ¶ 14.)  The parties agree that protestors marched in Michigan Avenue's northbound lanes (*id.* ¶ 14; Pl.'s Resp. to Defs.' Statement of Material Facts [127] (hereinafter "PR") ¶ 14), but Plaintiff claims the protestors also marched in the southbound lanes and that the CPD authorized them to do so.  (PR ¶¶ 14–15).  Defendants dispute both claims.  (Defs.' Resp. to Pl.'s Statement of Material Facts [143] (hereinafter "DR") ¶¶ 8–10.)

At around 7:00 p.m., the northward march ended as protestors gathered in the 900 block of North Michigan Avenue.  (PSF ¶ 11.)  Protestors stood on the western sidewalk, and some of them blocked the entrances to the Columbia and H&M stores.  (PR ¶ 19; DR ¶ 12.)  Plaintiff also stood on the western sidewalk chanting "no justice, no revenue" with other protestors.  (DSF ¶ 20.)  The parties dispute what was happening in the southbound lanes at that time: Defendants claim that southbound traffic continued moving, while Plaintiff insists that protestors remained in the southbound lanes as the demonstration gathered on the sidewalk.  (*See* PR ¶ 21; DR ¶ 13.)

Shortly after the protestors congregated on this sidewalk, an unidentified female protestor was arrested for repeatedly trying to enter the southbound lanes.  (DSF ¶ 23.)  She was taken by

CPD officers to the police transport van parked in the northbound left-turn-only-lane. (*Id.*) After this woman was placed under arrest, many protestors entered the street, though Plaintiff insists that many protestors were already in the southbound lanes and that they had permission to be there. (*Id.*; PR ¶ 23.) Just after 7:15 p.m., another protestor named Cameron Miller was arrested in a southbound lane. (PSF ¶ 14.) Additional protestors entered the street, approaching Mr. Miller and the arresting officers. (PR ¶ 25.) Plaintiff also entered the southbound lane at this time. (PSF ¶ 14.) According to Defendants, CPD officers ordered protestors to disperse (DSF ¶ 31), but Plaintiff insists that they were not ordered to leave the street (PSF ¶ 15).

Plaintiff does acknowledge that, while he stood in the street, an officer told him to "get back." (PSF ¶ 18.) Plaintiff has identified this officer as Defendant Roman, but Defendants dispute that it was Captain Roman who confronted Plaintiff. (*Id.*; DR ¶ 18.) Plaintiff claims he attempted to comply with the order but was unable to because he was surrounded by a crowd of protestors and officers. (PSF ¶ 19.) According to Plaintiff, as he stood in the street, unable to move, Captain Roman struck Plaintiff in the head and neck with his baton and brought Plaintiff to the ground. (*Id.*) Defendants acknowledge that another officer (not Roman) pushed the back of Plaintiff's head. (DSF ¶ 34.) Then, according to Defendants, Plaintiff turned around to yell at the police and then suddenly "lunged" into them. (*Id.* ¶¶ 34–35.)

Once he was on the ground, Plaintiff says, Defendants Lipkin, Augle, and other unidentified officers "shoved his face into the ground and pressed their hands and knees onto his body, using their body weight to cause him pain and to cause his face to bleed" as they handcuffed him. (PSF ¶ 20.) Defendants dispute that any such force was used on Plaintiff. (DR ¶ 20.) Instead, Defendants say, when Plaintiff landed on the ground, a supervisor ordered that Plaintiff be arrested and Defendants Lipkin and Augle, along with other unidentified officers, complied with that order and placed Plaintiff under arrest. (DSF ¶ 36.)

After being handcuffed, Plaintiff was pulled from the ground to his feet and walked to the paddy wagon parked in the northbound left-turn-only lane. According to Plaintiff, "Officers Augle,

Lipkin, and other police roughly pulled plaintiff's entire body off the ground by his arms" and "lifted him so hard his feet rose off the ground." (PSF ¶ 22.) But Defendants insist that the officers brought Plaintiff to his feet by his waistband and shirt in addition to his arms. (DSF ¶ 43.)

Officers Augle and Lipkin transported Plaintiff to the CPD station (PSF ¶ 25; DSF ¶ 3) where, according to Plaintiff, the two officers "struggled with what to charge Plaintiff with, as they had no knowledge that he violated any law." (PSF ¶ 25.) "Despite this, Officers Augle and Lipkin," Plaintiff states, "worked together with Officer Roman to bring false charges against the Plaintiff. Officer Augle wrote in a sworn police report and sworn criminal complaint that Plaintiff was placed under arrest after disobeying a direct order from Captain Roman to vacate the street." (*Id.* ¶ 26 (internal citations omitted).) Defendants dispute this characterization of the events, saying instead that "Officer Augle and Officer Lipkin—tactical officers who do not typically deal with traffic offenses—processed plaintiff and discussed the most appropriate charge for plaintiff's conduct with Lieutenant Cronin, who also told them that plaintiff had failed to comply with a direct order from Captain Roman to disperse and clear the street." (DSF ¶ 37.) Defendants also deny that Captain Roman played any role in Plaintiff's arrest or prosecution. (*Id.* ¶ 41.) Plaintiff was charged with violating a Chicago ordinance for failure to exercise due care as a pedestrian. (PSF ¶ 26.)

While he was at the station, Plaintiff asserts, an unidentified officer referred to him as an "N-word lover." (PR ¶ 38.) He also says that he initially declined any medical treatment because Officer Augle threatened to charge him with a felony if he sought treatment. (*Id.*) The next day, however, Plaintiff was taken to the emergency room and treated by a doctor for a cut above his left eye and an abrasion on his lower lip. (DSF ¶ 39.) Though not treated at that time, Plaintiff asserts that he also suffered injuries to his neck and chest as well as emotional harm. (PR ¶ 39.)

Plaintiff retained counsel to defend against the ordinance violation charge and demanded a jury trial. (PSF ¶ 33.) The parties agree that the charge was dropped on the day the trial was scheduled to begin. (*Id.* ¶ 34; DR ¶ 34.) Plaintiff says that the charge was dismissed "in a manner

consistent with his innocence" (PSF ¶ 34), while Defendants say that the charge was nonsuited and that it does not in any way indicate that he was innocent. (DR ¶ 34.)

Plaintiff initiated this suit in July 2017 and asserts claims under 42 U.S.C. § 1983 for excessive force and false arrest as well as state-law claims for battery, false imprisonment, and malicious prosecution against Defendants Roman, Augle, Lipkin, and unidentified officers. (Second Am. Compl. [106] ¶¶ 41–56.)  Plaintiff has also asserted *respondeat superior* and indemnification claims against the City of Chicago. (*Id.* ¶¶ 57–60.)  Defendants have moved for summary judgment [115] on all counts.

## DISCUSSION

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the burden of proving the absence of such a dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets that burden, the nonmoving party then bears the burden of demonstrating that there is a genuine dispute of material fact, "such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012).  The burden on the nonmovant "is not onerous," *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999), and the court "construe[s] all facts and reasonable inferences in favor of the nonmoving party." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  To defeat the motion, however, the nonmoving party must be able to point to more than the "mere existence of a scintilla of evidence in support of" her position. *Liu*, 191 F.3d at 796.

Defendants' memorandum in support of summary judgment [117] relies extensively on video recordings of the July 2016 Black Lives Matter demonstration.  "Although on summary judgment we generally view the facts in the light most favorable to the nonmovant, in rare circumstances when video footage clearly contradicts the nonmovant's claims, we may consider

that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)). After all, "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it." *Id.* But "videos are sometimes unclear, incomplete, and fairly open to varying interpretations," and therefore cannot always be a basis for summary judgment. *Id.*; *see also Hurt v. Wise*, 880 F.3d 831, 840 (7th Cir. 2018) ("Indeed, nothing about video evidence justifies placing it in such a privileged position."), *overturned on other grounds, Lewis v. City of Chi.*, 914 F.3d 472 (7th Cir. 2019). As discussed below, in accordance with these standards, the court grants Defendants' motion [115] in part and denies it in part.

## I.     Excessive Force and Battery

For his injuries afflicted during the course of his arrest, Plaintiff asserts a § 1983 claim for excessive force and a state-law battery claim against the Defendant Officers. (*See* Second Am. Compl. [106] ¶¶ 45–46, 51–53.) To prevail on his excessive force claim, Plaintiff must show that the Defendant Officers' use of force was "'objectively unreasonable' in light of the facts and circumstances confronting them." *Burton v. City of Zion*, 901 F.3d 722, 777 (7th Cir. 2018). And battery is an intentional tort for the unauthorized touching of the person of another. *Fiala v. Bickford Sr. Living Grp., LLC*, 2015 IL App (2d) 150067, ¶ 20, 43 N.E.3d 1324, 1240 (2d Dist. 2015). As explained here, Defendants are entitled to summary judgment for these claims regarding Captain Roman's conduct, but some of those asserted against Officers Augle, Lipkin, and the unidentified officers survive this motion.

### A.     Claims against Melvin Roman

The court begins by considering whether there is any genuine dispute of material fact regarding Defendant Roman's personal involvement in the conduct alleged to have caused Plaintiff's injuries. Plaintiff alleges that, immediately before he was arrested at the demonstration, "Captain Roman struck Plaintiff in the head, face and neck area with a baton and used his foot to

take Plaintiff to the ground." (PSF ¶ 19.) But the court agrees with Defendants that video of the demonstration indisputably establishes that Roman was not in Plaintiff's vicinity at that time.

At his deposition, Plaintiff testified that the officer who hit him was wearing a nametag bearing the name "Roman." (Pl.'s Dep., Ex. 5 to PSF, [128-5] at 27:3–24.) He also identified a picture of Roman from the day of the protest. (*Id.* at 24:14–25:14; *see* Ex. E to DR [146-5].) As Defendants note, this image shows a number of components of Roman's uniform, such as a white shirt, dark vest, lack of chevron on his sleeve, and a silver star on his chest. (Ex. A to DR [146-1]; Defs.' Reply in Supp. of Summ. J. [139] at 5.) Video footage of the demonstration—from several different angles—shows that the officer in that photograph was not within arm's reach of Plaintiff at the time he claims he was struck and taken to the ground. (*See* Ex. B to DR [146-2].) First, the video taken from a police observation device ("POD") at the intersection of North Michigan Avenue and East Chestnut Street shows Defendant Roman helping to pull Cameron Miller, another demonstrator arrested that day, from the right side of the frame through a throng of people to the CPD paddy wagon and leaving the frame on the left. (POD Chestnut Video, Ex. A to Orr Decl., Ex. 8 to DSF [118-8] at 16:45–17:15.) Plaintiff does for a moment get close to Roman, but several seconds later he appears to be pushed by another officer—wearing a gold star—off the frame to the right. (*Id.* at 17:11–21.) About forty seconds later, Plaintiff returns to the frame from the right when he appears to fall through a group of officers; he is pulled up in handcuffs by the officers about thirty seconds later and taken to the left side of the frame (where the paddy wagon is parked). (*Id.* at 18:00–45.) Roman, however, does not reappear in the frame at any time. (*Id.*)

A second POD video, from the Michigan Avenue and East Pearson Street intersection, displays a similar sequence, except that this camera faced north and therefore shows Roman exiting the frame to the right while Plaintiff moves away to the left. (POD Pearson Video, Ex. A to Orr Decl., Ex. 8 to DSF [118-8] at 16:53–18:45.) There is a third video, one uploaded to YouTube from the demonstration; that third video, too, shows Captain Roman assisting in moving

Miller in the opposite direction of Plaintiff. (YouTube Video, Ex. A to Orr Decl., Ex. 8 to DSF [118-8] at 4:18–40.) Finally, a fourth video taken by a journalist from a close angle, shows that it is Roman who is holding on to Miller and moving toward the paddy wagon. (Bauer Journalism Video, Ex. A to Orr Decl., Ex. 8 to DSF [118-8].)

Other evidence is also consistent with this version of the events. At his deposition, Roman offered an account of his arrest of Miller that conforms with the video footage. (*See* Roman's Dep., Ex. 1 to PSF, [128-1] at 69:5–70:22.) Roman also testified that while Roman was getting Miller into the wagon, another demonstrator (Jamal Green) grabbed Roman from behind (*id.* at 70:21–71:20) and that Roman assisted Lieutenant Cronin in arresting Green. (*Id.* at 71:19–73:3.) Green's criminal complaint notes that he was arrested for "tak[ing] hold of the duty belt of Captain Roman, just behind his firearm and mak[ing] physical contact without the peace officer's consent causing him to lose balance." (Ex. F to DR [146-6].) It was Roman who signed this criminal complaint. (*Id.*) All of these circumstances are consistent with the conclusion that Captain Roman was near the paddy wagon, several yards away from Plaintiff when his alleged injuries were inflicted.

Plaintiff insists that a genuine dispute of material fact nevertheless exists because Plaintiff has contended throughout the litigation that he recalls it being Captain Roman who struck him and brought him to the ground. (Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. [131] at 10.) But this appears to be one of those "rare circumstances when video footage clearly contradicts the nonmovant's claims." *Horton*, 883 F.3d at 944. That is, the court need not credit Plaintiff's deposition testimony when it is so clearly in tension with video footage from the event. Plaintiff suggests that the video footage is unclear, and that the officer who strikes him in the video resembles Captain Roman. (Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. [131] at 10.) The court disagrees; as noted earlier, that officer is clearly wearing a gold star on his chest while Captain Roman wore a silver star. Plaintiff is correct that the video footage is not dispositive about Roman's location at every moment (he is, for a time, outside the frame with Miller), but

other evidence, like Green's criminal complaint, confirms that he remained for some time by the paddy wagon, which was located just off the frame of the two POD videos—meaning that Roman was at least several yards away from Plaintiff when Plaintiff says he was struck. Plus, careful viewing of the footage shows that the officer who touches Plaintiff's head not only was wearing a gold star but also remained in the throng of people while Captain Roman left the screen. (*See* POD Chestnut Video, Ex. A to Orr Decl., Ex. 8 to DSF [118-8] at 16:45–18:45.)

Liability under § 1983 requires that a defendant be personally involved in a constitutional deprivation or that the injury "occurs at the official's direction or with his or her knowledge and consent." *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019). A defendant cannot be held liable for battery in Illinois without personal involvement as well. *Backes v. Vill. of Peoria Heights*, 662 F.2d 866, 871 (7th Cir. 2011). The video footage and other evidence establishes that Captain Roman was not personally involved in the application of any force used against Plaintiff. Nor has Plaintiff produced any evidence that other officers used force against Plaintiff at Roman's direction or with his knowledge and consent. The court therefore grants Defendant's motion for summary judgment regarding the § 1983 excessive force claim and state-law battery claim asserted against Captain Roman.

### B. Claims against Officers Augle and Lipkin

The excessive force and battery claims against the other Defendant Officers stand on a different footing. Plaintiff alleges that after he had been brought to the ground by the officer he identified as Captain Roman, "other officers, including Augle and Lipkin, shoved his face into the ground and pressed their hands and knees onto his body, using their body weight to cause him pain and to cause his face to bleed." (PSF ¶ 20.) Then, "Officers Augle, Lipkin, and other police roughly pulled plaintiff's body off the ground by his arms, which were handcuffed behind his back. They lifted him so hard his feet rose off the ground." (*Id.* ¶ 23.) These episodes of use of force are addressed separately below.

### 1.    Force Used when Plaintiff Was on the Ground

Starting with Plaintiff's allegations regarding what the officers did to him while he was on the ground, Defendants argue that video footage of the protest clearly contradicts Plaintiff's account because video shows that Lipkin and Augle were standing or kneeling by Plaintiff's lower body, making it impossible for them to have put their knees on Plaintiff's body or shove his head into the ground.  (*See* Defs.' Mem. in Supp. of Summ. J. [117] at 20.)  Specifically, Defendants contend that Officer Lipkin knelt down by Plaintiff's waist to help with handcuffing, that footage shows his knee was on the ground (not on Plaintiff's body), and that his only free arm was too far away from Plaintiff's head to have pressed it into the ground.  (*Id.* at 20–21.)  The footage that Defendants cite, however, is not so clear as to support summary judgment.  *See Hurt*, 880 F.3d at 840 ("*Scott* does not treat video footage as a distinct type of evidence that is not subject to the normal summary judgment strictures.  It holds only that a factual account should not be credited where the record contains evidence that is flatly contradictory to that account.").  In the Chestnut POD video clip that Defendants cite, Plaintiff is surrounded by several officers, including Lipkin.  (49 – Chestnut POD Video, Ex. B to Orr Decl., Ex. 8 to DSF [118-8].)  It is not possible to see where exactly Plaintiff's body is.  (*Id.*)  The clip does show Lipkin kneel down and lean his body weight forward, but it is not possible to see whether he makes contact with Plaintiff or, if he does, with which body part.  (*Id.* at 00:10–13.)  Two clips taken by a CPD evidence technician are also unclear.  (50 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF [118-8]; 51 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF [118-8].)  These clips record the same sequence, but in the second, the camera zooms in to show Lipkin up close; both begin when Plaintiff is already on the ground, and therefore provide no information about what might have happened prior to the selected footage.  (50 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF [118-8].)  Plaintiff is also surrounded by officers the whole time, making it hard to determine where his head or upper body is until just before the officers pull him up.  (*Id.*)  Importantly, the clips also reveal that Officer Lipkin held his baton in his left hand—apparently the hand closest to Plaintiff's head—making it

possible that Lipkin used his baton to press Plaintiff's head to the ground; another officer's body blocks the view of that hand and the baton. (51 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF [118-8].) Defendants have highlighted certain still images of the footage, but those still images do not clarify the location of Lipkin's hands, knees, or baton at all times while Plaintiff is on the ground. (*See* 52 – Ev. Tech. Video Screenshot, Ex. B to Orr Decl., Ex. 8 to DSF [118-8]; 53 – Ev. Tech. Video Screenshot, Ex. B to Orr Decl., Ex. 8 to DSF [118-8].)

As for Officer Augle, Defendants urge that video footage shows him kneeling with both knees on the ground beside the Plaintiff's waist and using both hands to handcuff Plaintiff, making it impossible for Augle to have been the one who harmed Plaintiff while he was on the ground. (Defs.' Mem. in Supp. of Summ. J. [117] at 21.) But the video footage is not "flatly contradictory" of Plaintiff's account. During much of the evidence-technician footage (which, as already noted, does not show definitively where Plaintiff's body is located), Augle's knees and hands are blocked by other officers. (55 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF [118-8].) Defendants have added a circle around Augle's feet to show that because his feet did not move positions, his knees must have remained firmly on the ground. Yet even if it were true that a person cannot move his knee without also moving his feet, the court can only clearly see one foot. (*Id.* at 00:04– 24.) Defendants acknowledge that the footage shows Augle's right hand pressing down on Plaintiff but insist that the video also demonstrates such action was accidental because another officer had pressed into Augle's back. (*See* 56 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF [118-8] at 00:10–13 (zooming in on Officer Augle's back, which has a hand on it).) Although that does seem like the most likely explanation for Augle's movement, the court does not see the clip as definitively establishing that Augle moved toward Plaintiff's head only because of the force of another officer. For instance, the other officer's body might be moving downward because Augle lunged his body toward Plaintiff's head. (*See* 57 – Ev. Tech. / Chestnut POD Video, Ex. B to Orr Decl., Ex. 8 to DSF [118-8].) Moreover, even if this one instance of Augle touching Plaintiff

was purely accidental, it does not negate the possibility that Augle used force other at times not shown.

Ultimately, the video footage cited by Defendant is not so clear about Officer Lipkin's or Officer Augle's conduct as to permit summary judgment on the excessive force or battery claims. The court also disagrees with Defendants that the video footage plainly shows that other, unidentified officers did not use excessive force on or commit a battery against Plaintiff. As already discussed, the scene in footage Defendant relies on is too crowded to account for the location of every other officers' hands and knees or Plaintiff's head, neck, and shoulders. (*See* 48 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF [118-8] (image showing group of officers crowded around Plaintiff).)

### 2. Qualified Immunity / State Law Immunity

Disputes that preclude summary judgment on the merits of Plaintiff's claims do not end the analysis. Defendants would still be entitled to summary judgment if Plaintiff's excessive force claim is barred by qualified immunity and his battery claim is barred under Illinois law. Qualified immunity "protects government officials from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982)). Plaintiff testified at his deposition that after he was brought down to the ground by a CPD officer, officers pressed down on his body, resulting in pain and a wound to his head. (Pl.'s Dep., Ex. 5 to PSF, [128-5] at 215:16–24, 157:21–158:1.) His head wound was significant enough that he had to be brought to the hospital the next day to receive stitches. (*Id.* at 350:1–2.) The Supreme Court has instructed that whether the use of force was excessive "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Here, Plaintiff was arrested for failing to exercise due care as a pedestrian. Both Officers Lipkin and Augle have acknowledged that Plaintiff did not resist his arrest. (Augle's Dep., Ex. 2 to PSF, [128-2] at 57:1–7; Lipkin's Dep., Ex. 3 to PSF, [128-3] at 116:20–23.) Under such circumstances, placing a knee on Plaintiff's back or shoving his face into the asphalt does not appear to be reasonable. *See Abbott v. Sangamon Cty.*, 705 F.3d 706, 732 (7th Cir. 2013) ("Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects."). Indeed, Augle and Lipkin themselves recognized that the force Plaintiff describes as used on him would be unreasonable. (*See* Augle's Dep. at 28:23–29:11; Lipkin's Dep. at 53:2–14.) Defendants insist that Plaintiff lunged into the officers and was not handled roughly, rendering any contact between the Officers and Plaintiff reasonable. (*See* Defs.' Reply in Supp. of Summ. J. [139] at 15.) But the court must view the record in the light most favorable to the nonmovant, and why Plaintiff ended up on the ground and the extent of force used are subject to genuine dispute. *See Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)) ("As one of our sister circuits has observed, since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'").

The analysis for state-law immunity is much the same. In Illinois, "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. "Willful and wanton conduct" refers to "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *Id.* at § 1-210. Illinois courts have said that "whether [a] defendant is liable for wilful and wanton behavior is ordinarily a question for the jury." *Geimer v. Chi. Park Dist.*, 272 Ill. App. 3d 629, 637, 650 N.E.2d 585, 592 (1st Dist. 1995). "Summary judgment may

be granted, however, if the evidence, viewed in the light most favorable to the non-movant, 'so overwhelmingly favors the movant that no contrary verdict . . . could stand.'" *Watson v. Fulton*, No. 15 C 11559, 2020 WL 1248678, at *12 (N.D. Ill. Mar. 16, 2020) (quoting *Geimer*, 272 Ill. App. at 637, 650 N.E.2d at 592).  The evidence that Defendants cite does not meet this high bar.  The video footage is too indeterminate for the court to conclude that no reasonable jury would believe Plaintiff's account over that of the Defendant Officers.  Defendants are therefore not entitled to immunity on the battery claim at this stage.

Because there remains a genuine dispute of material fact about these excessive force and battery claims, the court also declines to grant Defendants' request for summary judgment on the issue of punitive damages.  "In an action under § 1983, 'a jury may be permitted to assess punitive damages . . . when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019).  Illinois law permits punitive damages for fraud, actual malice, deliberate violence or oppression, willfulness, or gross negligence.  *Parker v. Four Seasons Hotels Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017) (citing *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359 (1978)).  Defendants contend that punitive damages cannot be awarded because Plaintiff testified that he did not think that Augle or Lipkin were "trying to go get me" and did not offer evidence that the Officers had animus against him.  (Pl.'s Dep., Ex. 5 to PSF, [128-5] at 554:4–555:8.)  But without conclusive evidence about how Plaintiff ended up on the ground or the Defendant Officers' conduct while Plaintiff was on the ground, whether the Defendant Officers engaged in conduct warranting punitive damages remains a genuinely disputed issue between the parties.  This case is therefore unlike *Grant v. City of Fort Wayne*, No. 16 C 380, 2018 WL 689799, at *7 (N.D. Ind. Feb. 2, 2018), where the court granted the defendants' motion for summary judgment on punitive damages because the plaintiff "produced

no evidence, nor even suggested" how an officer defendant had shown "reckless or callous indifference to the federally protected rights of others."[1]

### 3. Force Used in Pulling Plaintiff to His Feet

Next, the court turns to the excessive force and battery claims related to Plaintiff's being pulled up from the ground. The video evidence here is much clearer than that discussed above and amply supports Defendants' account that the Officers did not roughly bring Plaintiff to his feet by pulling on his arms alone. Instead, the video shows that the Officers pulled Plaintiff up by his shirt and waistband, in addition to his arms. (*See* 44 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex 8 to DSF [118-8]; 45 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF [118-8] (screenshot showing Officers' hands on Plaintiff's shirt).) During his deposition, Plaintiff himself acknowledged that the video showed that he was lifted not only by his arms but also by his shirt and pants as well. (Pl.'s Dep., Ex. 5 to PSF, [128-5] at 531:2–532:15.) Defendants argue that because he was lifted up in this way, they are entitled to summary judgment on this aspect of the excessive force and battery claims. But the fact that Plaintiff's recollection of the event appears incorrect does not necessarily render the force reasonable as a matter of law. It is possible, for example, that most of the force was still exerted on Plaintiff's arms—even though some officers had a grasp of his clothes—and that a jury could interpret this as unreasonable in light of the undisputed fact that Plaintiff was not resisting arrest. *See Sallenger v. Oakes*, 473 F.3d 731, 742 (7th Cir. 2007) (quoting *Abdullahi*, 423 F.3d at 773 (7th Cir. 2005)) ("[S]ince the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'"). Similarly, Defendants are wrong to

---

[1] Defendants also cite *Saathoff v. Davis*, No. 13 C 2253, 2015 WL 13307406, at *2– 4 (C.D. Ill. June 29, 2015), but it is inapposite. The cited portion of that case concerned whether punitive damages could be awarded for a § 1983 claim after the court had previously held that the defendant officer was entitled to state-law immunity because his conduct had not been willful or wanton. There has been no such previous ruling by this court, and so *Saathoff* does not apply.

insist that the force must have been reasonable because Plaintiff neither complained about it at the time nor suffered any apparent physical injury from it; lack of injury is not an element of an excessive force claim, *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) ("Plaintiffs need not show physical injury in order to sustain an excessive force claims."), or a battery claim, *Cohen v. Smith*, 269 Ill. App. 3d 1087, 1091, 648 N.E.2d 329, 333 (5th Dist. 1995) ("Causing actual physical harm is not an element of battery.").

### 4.    Qualified Immunity / State Law Immunity

The court nonetheless agrees with Defendants that the Defendant Officers are entitled to qualified immunity and state-law immunity with respect to this part of the excessive force and battery claims.  As already noted, qualified immunity requires the court to address "whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct."  *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).  But Plaintiff has not established that the officers' conduct in question violated a clearly established right.  Indeed, courts have granted summary judgment in favor of police officers in circumstances similar to these.  *See, e.g., Kyles v. Thiel*, No. 01 C 9007, 2004 WL 1630776, at *1 (N.D. Ill. 2004) (granting summary judgment for defendant police officer who had allegedly "jerked [the plaintiff] to her feet by the handcuffs rather than being lifted by her arms"); *Wasko v. Difilippo*, No. 06 C 37, 2007 WL 869211, at *7 (N.D. Ind. Mar. 19, 2007) ("The Defendant's conduct was in the context of getting a handcuffed suspect onto his feet.  The case law is not such that the Defendant had fair warning his conduct was unlawful.").  "The plaintiff carries the burden of defeating the qualified immunity defense," *Chasensky v. Walker*, 740 F.3d 1088, 1095 (7th Cir. 2014), but Plaintiff has identified no case law determining that police officers are liable for pulling a handcuffed suspect to his feet.  That is, Plaintiff has not shown that a clearly established constitutional right was violated; summary judgment is therefore appropriate.

Plaintiff's battery claim is also barred under state law.  As explained above, Officers Augle and Lipkin could be liable for battery only if their conduct was willful and wanton.  745 ILCS 10/2-

202. "Conduct that is 'willful and wanton" under § 2-202 is narrower than the conduct that would be considered 'unreasonable' under the Fourth Amendment; therefore, reasonable conduct is highly unlikely to be 'willful and wanton.'" *Brunson v. City of Chi.*, No. 11 C 02011, 2013 WL 870521, at *6 (N.D. Ill. Mar. 7, 2013) (citing *Carter v. Chi. Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998)). The court's holding that the Officers are entitled to qualified immunity on the excessive force claim does not by itself mean that they acted reasonably; the court instead concluded only that any right they may have violated was not clearly established. *See id.* Still, Plaintiff has not produced evidence that Augle, Lipkin, or any other officer intended to harm him or recklessly disregarded a substantial risk of harm when they lifted him to his feet. Summary judgment is therefore appropriate for this battery claim as well.

## II.      False Arrest, False Imprisonment, and Malicious Prosecution

Plaintiff has also asserted a § 1983 claim for false arrest and state-law claims for false imprisonment and malicious prosecution. (Second Am. Compl. [106] ¶¶ 41–44, 47–50, 54–56.) Defendants argue that they are entitled to summary judgment with respect to these claims because the Defendant Officers had probable cause to arrest and charge Plaintiff, which is an absolute bar to any of these claims. *See Muhammad v. Pearson*, 900 F.3d 898, 907 (7th Cir. 2018) (quoting *Stokes v. Bd. of Educ. of City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010)) ("Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983."); *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 473–74, 564 N.E.2d 1222, 1231 (1990) (noting that lack of probable cause is an element of malicious prosecution and false imprisonment claims).

"Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012) (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir.2009)). Plaintiff was arrested and charged

for failing to exercise the duty of due care required of a pedestrian.  CHI. MUN. CODE § 9-60-120.[2]

The Illinois Supreme Court has construed "due care" to refer to "that degree of care which ordinarily prudent persons are accustomed to exercise under the same or similar circumstances." *People v. Wawczak*, 109 Ill. 2d 244, 250, 486 N.E.2d 911, 914 (1985) (quoting *Roberts v. Chi. City Ry. Co.*, 262 Ill. 228, 233, 104 N.E. 708, 710 (1914)).  Defendants argue that it was reasonable for Officers Augle and Lipkin to believe that Plaintiff had violated § 9-60-120 because he was in a southbound lane of North Michigan Avenue, without being in a crosswalk or otherwise having permission to be in the street.  The court agrees.

The parties do not dispute that CPD officers blocked the northbound lanes of North Michigan Avenue as the protestors marched north from the Taste of Chicago.  They do disagree, however, about whether the police also authorized the protestors to be in the southbound lanes during the northward march.  This is a genuine dispute, not resolved by any clear video or other evidence, but it is not a material dispute.  The march north stopped at the 900 block of North Michigan Avenue, when protestors moved from the northbound lanes across the southbound lane to the western sidewalk where they blocked the entrances to the H&M and Columbia stores.  (*See* POD Chestnut Video, Ex. A to Orr Decl., Ex. 8 to DSF [118-8] at 5:00–6:00.)  Many cars were in the southbound lane at the time.  (*See id.*)  As the protestors congregated on the sidewalk, police can be seen trying to ensure that traffic in the southbound lanes continues to move and that protestors stay out of the street.  (*See id.* at 6:30–8:00; 9 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF [118-8]; 10 – YouTube Video, Ex. B to Orr Decl., Ex. 8 to DSF [118-8].)  Some protestors can be seen leaving the sidewalk and entering the southbound lanes after one of the protestors, who had remained in the street despite police effort to get her to return to the sidewalk, is taken to the paddy wagon.  (*See* POD Chestnut Video, Ex. A to Orr Decl., Ex. 8 to DSF [118-

---

[2]          In their brief, Defendants identify other state and municipal statutes that Plaintiff may have been violating at the time of his arrest.  (*See* Defs.' Mem. in Supp. of Summ. J. [117] at 11–12.)  The court declines to address these other alleged violations.

8] at 8:00–9:00; POD Pearson Video, Ex. A to Orr Cedl., Ex. 8 to DSF [118-8] at 8:00–9:15.)

Cameron Miller, too, was arrested while standing in a southbound lane (14 – Ev. Tech. Video II,

Ex. B to Orr Decl., Ex. 8 to DSF [118-8]; 15 – Ev. Tech. Video II, Ex. B to Orr Decl., Ex. 8 to DSF

[118-8]), leading yet more protestors—including Plaintiff—to enter the street (POD Chestnut

Video, Ex. A to Orr Decl., Ex. 8 to DSF [118-8] at 16:41–58).  Though Plaintiff was twice ordered

by an officer he identified as Captain Roman to "get back" (Pl.'s Dep., Ex. 5 to PSF [128-5] at

472:17–473:13), he did not return to the sidewalk and was arrested moments later.

Plaintiff testified that he thought the meaning of "get back" was ambiguous.  (*Id.* at 486:4–

7.)  Although Officers Lipkin and Augle did not hear that order being given specifically to Plaintiff,

they both recall similar orders being given to the crowd of protestors on the street at that time.

(Lipkin's Dep., Ex. 3 to PSF, [128-3] at 107:7–14; Augle's Dep., Ex. 2 to PSF, [128-2] at 101:11)

Cars remained in the southbound lanes the whole time, blocked by the demonstrators in the street

when Plaintiff ended up on the ground.  (POD Pearson Video, Ex. A to Orr Decl., Ex. 8 to DSF

[118-8] at 15:30–18:04.)  At that point, it was reasonable for the officers to believe that Plaintiff

had committed an offense.  *See Marcavage v. City of Chi.*, 659 F.3d 626, 632 (7th Cir. 2011)

(holding that officers had probable cause to arrest the plaintiff who "stubbornly refused to move

from his position on a crowded street corner during a heavily populated event, insisting that he

had a right to demonstrate there").

Plaintiff points to *Vodak v. City of Chi.*, 639 F.3d 738 (7th Cir. 2011), to argue that he had

implicit authorization to be in the street, meaning that there was no probable cause for his arrest.

But *Vodak* is distinguishable.  In *Vodak*, 639 F.3d at 740–41, the Seventh Circuit considered

Fourth Amendment claims brought by numerous antiwar demonstrators who had been arrested

during a protest march.  Although there was no formal permit for the protest, police permitted the

demonstrators to march in the street.  *Id.* at 745–46.  But after the march had been proceeding

for some time, the police ordered the demonstrators to disperse or return to where the march had

begun.  The police then began arresting hundreds of demonstrators several blocks away who had

failed to leave the streets. *Id.* The court held that those arrests were unsupported by probable cause, because it would be unreasonable for an officer to think that those hundreds of protestors on one street would have known about an order given blocks away. *Id.* at 746. As the Seventh Circuit said, "the Fourth Amendment does not permit the police to say to a person go ahead and march and then, five minutes later, having revoked the permission for the march without notice to anyone, arrest the person for having marched without police permission." *Id.* at 746–47.

Plaintiff believes this case is like *Vodak.* He contends the Black Lives Matter protestors had been given implicit permission by the police to be in the street and that it was unreasonable for the police to quickly revoke that permission and begin making arrests. But whether or not the CPD had implicitly authorized the protestors to be in the southbound lanes in the northward march on Michigan Avenue, it is clear that once the protest moved to the west sidewalk of the 900 block, the police were trying to keep protestors out of the southbound lanes. Unlike in *Vodak*, where hundreds of arrestees may not have heard the dispersal order, Plaintiff did hear an officer tell him to "get back." Moreover, even if neither Augle nor Lipkin had heard that exact order, they knew that other officers had told the protestors—far fewer in number than those in *Vodak*—at that time to get back or disperse. It was therefore reasonable for the officers to believe Plaintiff had heard a dispersal order, in contrast to the demonstrators in *Vodak*, establishing that they had probable cause to arrest and charge Plaintiff for violating § 9-60-120.

Plaintiff makes much of the fact that his arrest report and criminal complaint say that he failed to comply with an order to disperse by Captain Roman and yet Defendants (correctly) maintain that Roman was not beside Plaintiff when he was arrested and that Roman does not recall giving an order directly to Plaintiff. (*See* Roman's Dep., Ex. 1 to PSF, [128-1] at 94:20–24.) But Roman testified that he did yell at protestors to "get off the street, move back" several times (*id.* at 94:13–19), meaning that he could have given Plaintiff such an order before he left the crowd of protestors while bringing Miller to the paddy wagon. Moreover, as already noted, Officers Augle and Lipkin testified that they heard other officers give out such orders, and Plaintiff acknowledged

hearing an order to "get back." Therefore, it was reasonable for the officers to conclude that Plaintiff had been given and, based on the fact that he was arrested in the street, had violated such an order. Plaintiff has not explained why the possible misidentification of the officer who gave him the order defeats probable cause. In fact, because § 9-60-120 prohibits only failures to exercise due care and does not mention refusing to follow a police officer's order, it is not clear how this dispute could affect any probable cause determination, rendering it immaterial.

Nor does the court put much significance in the time it took Officer Lipkin and Augle at the police station to decide which ordinance to charge Plaintiff with violating. Probable cause is an *objective* standard; an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see also id.* (quoting *Whren v. United States*, 517 U.S. 806, 814 (2004)) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent."). As the Seventh Circuit has said, "an arrest can be supported by probable cause that the arrestee committed any crime, regardless of the officer's belief as to which crime was at issue." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 715 (7th Cir. 2013) (citing *Devenpeck*, 543 U.S. at 153). That is, probable cause may still exist even if, as Plaintiff testified, Officers Augle and Lipkin took much time "trying to figure out what to charge [him] with" and were uncertain as they looked through "the list of potential charges . . . to find something that matched up." (Pl.'s Dep., Ex. 5 to PSF, [128-5] at 275:18–276:13.)

Ultimately, this is not one of those cases where "a jury must determine the existence of probable cause" because there is not "room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Gonzalez v. City of Elgini*, 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013–14 (7th Cir. 2006) (finding that there was "room for difference" about whether there was probable cause because firsthand testimony disputed the defendant officers' accounts). Because there was probable cause to arrest and charge Plaintiff with violating § 9-60-120, the court grants summary judgment

to Defendants on the § 1983 false arrest claim and state-law false imprisonment and malicious prosecution claims.

## III.    Indemnification and *Respondeat Superior*

Finally, Plaintiff has asserted against the City of Chicago claims for indemnification and *respondeat superior* under Illinois law.  Under either theory, the City may only be liable only to the extent that an employee is liable.  *See* 745 ILCS 10/9-102 ("A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable."); *Adames v. Sheahan*, 233 Ill. 2d 276, 298, 909 N.E.2d 742, 754 (2009) ("Pursuant to the theory of *respondeat superior,* an employer can be liable for the torts of his employee when those torts are committed within the scope of the employment.").  Hence, the court grants summary judgment to Defendants on these two claims, except as they relate to the battery claim concerning the Defendant Officers' conduct while Plaintiff was on the ground.

## CONCLUSION

Defendants' motion for summary judgment [115] is granted in part and denied in part.  The motion is granted for those claims asserted against Defendant Roman; the false arrest, false imprisonment, and malicious prosecution claims; the excessive force and battery claims with respect to the Defendant Augle, Lipkin, and unidentified officers pulling Plaintiff to his feet; and related indemnification and *respondeat superior* claims.  The motion is denied for the excessive force, battery, and related indemnification and *respondeat superior* claims to the extent they concern Defendant Augle's, Lipkin's, and unidentified officers' conduct while Plaintiff was on the ground.

ENTER:

Dated:  March 30, 2020

_____
REBECCA R. PALLMEYER
United States District Judge